**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **GIL COSTA,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 24-cv-12456-DJC** |
| | ) | |
| **CITY OF FALL RIVER and PAUL GAUVIN,** | ) | |
| **individually and in his official capacity as** | ) | |
| **Chief of the Fall River Police Department,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

**CASPER, C.J.**                                                                                  **July 15, 2026**

**I.       Introduction**

Plaintiff Gil Costa ("Costa") has filed this lawsuit against Defendants City of Fall River

(the "City") and Paul Gauvin ("Gauvin") (collectively, "Defendants"), asserting claims for

violations of the Massachusetts Whistleblower Act, Mass. Gen. L. c. 149, § 185 (Count I); 42

U.S.C. § 1983 (Count II); and the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, §§ 11H-

11I (Count III).  D. 1-1.  Defendants have moved for summary judgment.  D. 24.  For the reasons

stated below, the Court ALLOWS the motion.

**II.      Standard of Review**

The Court grants summary judgment where there is no genuine dispute as to any material

fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a).  "A genuine issue is one that can 'be resolved in favor of either

party' and a material fact is one which 'has the potential of affecting the outcome of the case.'"

1

Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013) (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the nonmovant may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial, Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).

"Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact."  Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997).  The Court reviews the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in his favor, Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001), but only "to the extent supportable by the record," Scott v. Harris, 550 U.S. 372, 380, 381 n.8 (2007) (emphasis omitted).

## III.    Legal Background

Massachusetts city police officer positions are typically subject to the state civil service law.  See Mass. Gen. L. c. 31, §§ 51, 59; Sherman v. Town of Randolph, 472 Mass. 802, 804 (2015).[1]  The "fundamental purposes of the civil service system [are] to guard against political considerations, favoritism, and bias in governmental employment decisions . . . and to protect

---

[1] After Costa initiated this lawsuit, the legislature substantially amended the civil service law.  See An Act Relative to Strengthening Massachusetts' Economic Leadership, c. 238, §§ 103-163, 2024 Mass. Acts 1184, 1288-1302.  The Court cites the 2022 edition of the Massachusetts General Laws.

efficient public employees from political control." City of Cambridge v. Civ. Serv. Comm'n, 43 Mass. App. Ct. 300, 304 (1997).

Pursuant to the civil service law, an applicant for a civil service appointment must take a competitive examination developed by the Commonwealth's Human Resources Division ("HRD"), see Mass. Gen. L. c. 31, §§ 1, 6, 16; Sherman, 472 Mass. at 804; Malloch v. Town of Hanover, 472 Mass. 783, 787 (2015), or, in some circumstances, the relevant municipality, see Mass. Gen. L. c. 31, § 5(l); Lopez v. City of Lawrence, No. 07-cv-11693-GAO, 2014 WL 12978866, at *5 (D. Mass. Sept. 5, 2014), aff'd, 823 F.3d 102 (1st Cir. 2016). For present purposes, the promotional process is similar to the original appointment process. See Mass. Gen. L. c. 31, § 59. At times, the HRD examination score has included both a test score and an "education and experience" rating. See, e.g., Lopez, 2014 WL 12978866, at *5. An examination score may also include additional points reflecting a hiring preference. See id.; Mass. Gen. L. c. 31, §§ 26, 59.

When an appointing authority alerts HRD to an open position, HRD certifies a list of eligible candidates that is ranked in order of the candidates' scores. See Mass. Gen. L. c. 31, §§ 25, 59; Sherman, 472 Mass. at 804. An appointing authority may interview certified candidates and is authorized to "bypass" a candidate at the top of the eligible list if there is a "reasonable justification" for doing so. Sherman, 472 Mass. at 804, 810-11; see Mass. Gen. L. c. 31, § 27. If the appointing authority bypasses a higher-ranked candidate who was willing to accept the appointment, it must provide a written statement of reasons for the bypass. Mass. Gen. L. c. 31, § 27; Sherman, 472 Mass. at 804. Bypassed candidates may appeal to the Civil Service Commission (the "Commission"). See Mass. Gen. L. c. 31, § 2(c); Sherman, 472 Mass. at 804.

## IV.    Factual Background

The Court draws the following facts from the parties' statements of material facts and

accompanying exhibits and Costa's response to Defendants' statement of material facts.  D. 24; D. 25; D. 32; D. 33; D. 34.[2]

### A.    Costa's Promotion History Prior to 2021

At all relevant times, the City police department's (the "Department's") ranks of police officer, sergeant, lieutenant, captain and deputy chief were civil service positions, but police chief was not.  D. 25 ¶ 22.[3]  The police chief is the appointing authority for subordinates.  Id.  Costa was hired as an officer of the Department in 1989.  D. 25 ¶ 1; D. 34 ¶ 1.  The hiring processes used for Costa were written examinations.  D. 25 ¶ 18.  The Department has used interview panels as part of the promotional process.  Id. ¶ 24.

Costa first participated in a promotional process around 1999 or 2000, and he was twice bypassed for promotion from the resulting eligible list.  Id. ¶¶ 30-34.  Costa was later promoted to temporary, then permanent, sergeant.  Id. ¶ 35.  Costa next participated in a promotional process in 2017, which resulted in his promotion to temporary lieutenant.  Id. ¶¶ 36, 39-42.  Shortly thereafter, Costa was made permanent lieutenant.  Id. ¶ 43.  After his promotion to lieutenant, Costa was assigned as the commander of Professional Standards.  Id. ¶ 58; see D. 24-3 at 12 (explaining role of Department's Office of Professional Standards).

---

[2] Costa disputes only ¶¶ 100, 109, 120-21, 126, 130 and 159 of Defendants' statement of facts.  D. 33 at 1-3.  The remaining facts, to the extent material, are deemed admitted for purposes of resolving the motion.  See L.R. 56.1.  Although Defendants did not respond to Costa's statement of additional facts, D. 34, such are not deemed admitted.  See Mackey v. Town of Tewksbury, No. 15-cv-12173-MBB, 2020 WL 68243, at *4 (D. Mass. Jan. 7, 2020).  "Rather, the additional statement simply provides a means for [Costa] to identify purported disputes in the record which, based on the cited exhibit itself, may give rise to a genuinely disputed material fact."  Id.

[3] Effective January 29, 2026, the Department's police chief position will become a civil service position when it is next vacant.  An Act Regulating the Appointment of the Police Chief in the City of Fall River, c. 10 (2026), https://malegislature.gov/Laws/SessionLaws/Acts/2026/Chapter10.

### B.    Costa's Duties Regarding Misconduct

Costa considers it one of his responsibilities to the Department to report misconduct. D. 25 ¶¶ 48-50. The Department's rules require members to report certain misconduct of other Department employees through the chain of command in writing or, in some circumstances, report same to the police chief. Id. ¶ 55; see D. 24-3 at 18. Department rules also prohibit employees from knowingly falsifying official reports or entering inaccurate information into Department records. D. 25 ¶ 56; D. 24-3 at 21. Costa testified that he believed it would be conduct unbecoming of a police officer to fail to report another officer for violating the law. D. 25 ¶ 57.

Costa also testified that the Department is obligated to investigate allegations regarding compensatory time or salary theft. Id. ¶ 49. When Costa served as commander of Professional Standards, the then–police chief, Al Dupere ("Dupere"), ordered Costa to investigate allegations against another member of the Department, including allegations that the individual had stolen compensatory time and salary. Id. ¶¶ 41, 58-62. Costa believes that around this time, a group including Gauvin formed to undermine Dupere, leading Dupere to step down from his role as police chief. Id. ¶¶ 64-65. The subsequent police chief, Jeff Cardoza ("Cardoza"), quickly reassigned Costa from Professional Standards to the Uniform Division, which Costa perceived as retaliatory. Id. ¶¶ 64, 67, 72-73. Costa had difficulties with Cardoza, including with respect to the Professional Standards investigations discussed above, a transfer request and certain compensatory and vacation time grievances. See id. ¶¶ 70-71, 77-80, 82-85, 88-91.

Costa testified that the complaint's allegation that he faced retaliation concerning his opposition to "illegality," see D. 1-1 at 2, referred to his opposition "to the illegality" and his "duties" to "report it," and he agreed that this concerned "the comp time issue," see D. 24-1 at 50-51; D. 25 ¶ 100. Costa disputes Defendants' characterization of this testimony, contending that he believed at the time of a May 18, 2021 union meeting at which he raised a compensatory time

5

issue concerning Gauvin "that the extra comp time was a violation of labor law" and that "he did not have a duty to report it," see D. 33 at 1; D. 34 ¶ 6.[4]

### C.       Events Surrounding the Union Meeting

As of early 2021, one of Gauvin's duties was to track on-call time.  D. 25 ¶ 103.  At the time, Gauvin was a captain in the Major Crimes Division.  See id. ¶¶ 5, 103-04.  The Department's union contract provided for supervisors in the division to receive six hours of compensatory time for each week of on-call service and for detectives to receive four hours.  Id. ¶ 104.  Despite this, Gauvin awarded eight such hours to supervisors and six to detectives.  Id. ¶ 105; see D. 34 ¶¶ 2-3.

At some point prior to May 18, 2021, Costa, then a lieutenant in the Uniform Division, learned while at work that Gauvin was improperly recording compensatory time for himself and his subordinates.  D. 25 ¶¶ 101-02; D. 34 ¶ 2.  Lieutenant Kelly Furtado ("Furtado") led him into the office of Captain Mike Duarte ("Duarte"), who showed Costa a payroll record illustrating the compensatory time discrepancies.  D. 34 ¶¶ 2, 7, 16; see D. 25 ¶¶ 101-02.  As of May 18, 2021, Costa believed that Gauvin had Cardoza's permission for the extracontractual accruals.  D. 25 ¶ 109; D. 33 at 1.  Costa intended to use this matter as an opportunity to push back against issues he had been experiencing with Cardoza.  D. 25 ¶ 112.  Costa attended a meeting of the Department's superior officers' union on May 18, 2021, id. ¶¶ 113, 116, while he was off-duty, D. 34 ¶ 4 (citing D. 32-1 ¶ 5).  Some meeting attendees outranked Costa.  D. 25 ¶ 116.  One such person was Barden Castro ("Castro"), who announced his resignation as union president during this meeting in light of his recent assignment as commander of Professional Standards.  Id. ¶¶ 115-16.  At the meeting, Costa spoke regarding benefits some members, including in the Major Crimes

---

[4] The record reflects that Costa's references to labor law concern Massachusetts General Laws chapter 150E ("Chapter 150E").  See D. 24-1 at 121; D. 34 at 2 n.1.

Division, were receiving outside of the union contract.  Id. ¶ 116; D. 34 ¶ 5.  Costa assumes that Castro, Cardoza's "right-hand man" in Castro's new role, informed Cardoza of the compensatory time issue Costa had raised.  D. 25 ¶ 116.  Later on May 18, 2021, Costa had another Department employee print a transaction history report memorializing the issues Costa raised at the union meeting.  Id. ¶ 117; D. 34 ¶¶ 9-12; see D. 24-9.

At some point prior to the date of the union meeting, Gauvin learned from a member of his unit that Gauvin had been wrongly recording compensatory time for on-call service.  D. 25 ¶ 120.  Gauvin began a process to correct the figures.  Id. ¶ 121.  Costa contends that such changes were personally made by Gauvin and occurred only after the union meeting, on May 19, 2021.  D. 33 at 2; see D. 34 ¶ 19.[5]  On May 19, 2021, Cardoza asked Gauvin about the compensatory time issue, and Gauvin responded that he was aware of and working to fix the errors.  D. 25 ¶ 122.  The May 18, 2021, transaction report reflects six (rather than eight) hours of compensatory time recorded for Gauvin on May 14, 2021, four days prior to the union meeting.  D. 25 ¶ 123; D. 24-9 at 16.

Approximately one week after the union meeting, Costa and Gauvin were attending a training, and Gauvin asked to speak with Costa.  D. 25 ¶ 128.  Costa testified that as part of that conversation, Gauvin asked why Costa raised the compensatory time issue at the union meeting without calling Gauvin first.  Id. ¶ 129.[6]  Gauvin told Costa that Gauvin had admitted the issue to Cardoza and was correcting it.  Id. ¶ 130.  Up to that point, Costa believed that Cardoza had

---

[5] Costa attested that Gauvin made such changes "[w]hen Gauvin learned of the statement [Costa] made at the May 18 [u]nion meeting" but does not explain the basis for such knowledge.  See D. 32-1 ¶ 12.  Costa submitted an exhibit, which appears to be a photograph of a computer screen, see D. 32-5 at 1, that Costa attested "shows that . . . Gauvin altered payroll entries" on May 19, 2021.  D. 32-1 ¶ 12.  Costa attested that Gauvin's changes "erased multiple entries for multiple officers occurring over a several month period."  Id.; D. 34 ¶ 20.

[6] Gauvin testified that he did not remember how he learned about Costa's allegations but that he believed Cardoza may have mentioned it to him during their May 19, 2021 conversation.  D. 24-2 at 20.

7

authorized the extracontractual time.  D. 34 ¶ 21 (citing D. 32-6 at 5).  Gauvin told Costa it was a mistake, which Costa does not believe.  Id.; D. 33 at 2.  Costa testified that during this conversation, Gauvin said something like, "To the victor goes the spoils," which Costa thought was odd.  D. 25 ¶ 131; D. 24-1 at 135; see D. 34 ¶¶ 21-22.  Gauvin testified that he wanted to clear the air with Costa at the training, and that his comment was intended to convey that it was up to Cardoza to decide assignments, including Costa's reassignment from Professional Standards.  D. 25 ¶¶ 132-33.  Gauvin became interim police chief in December 2021, and his appointment became permanent in May 2022.  Id. ¶¶ 6, 134.[7]  Costa does not recall having contact with Gauvin between their conversation at the training and Gauvin's promotion.  Id. ¶ 135.

### D.    Relevant Promotion Decisions

#### 1.    May 2022

In May 2022, the Department announced an open captain position.  D. 34 ¶ 26 (citing D. 32-1 ¶ 15).  At the time, Costa was ranked third on the eligible list.  D. 25 ¶¶ 136-37.  The first-ranked candidate was promoted over Costa.  Id. ¶ 138; D. 34 ¶ 28.

#### 2.    July 2022

In July 2022, a temporary captain position was available, and Costa and Furtado were the only candidates for the promotion.  D. 25 ¶¶ 141, 143; D. 34 ¶ 29.  Furtado had scored below Costa on the written examination.  D. 25 ¶ 143; see D. 34 ¶ 30.  Costa testified that he suspected the interview panel convened was fixed in Furtado's favor and that he believes his bypass was retaliation for bringing the compensatory time issue to light.  D. 25 ¶¶ 144-47; see D. 34 ¶ 31.  The panel unanimously recommended Furtado for promotion, and Gauvin informed HRD on July 22,

---

[7] Costa attested that Gauvin became police chief in February 2022.  D. 32-1 ¶ 13.  To the extent this is a genuine dispute, it is immaterial.

8

2022, that he had selected Furtado. D. 25 ¶¶ 148-49. Castro informed Costa of the decision by phone, and Costa hung up after stating, "let the games begin," which he testified could have been considered insubordinate. Id. ¶¶ 150, 153-54.

Costa later met with Gauvin and Castro and apologized for his comment to Castro. Id. ¶¶ 155, 157. During this meeting, Gauvin stated that he had heard Costa was "banging his chest" about the bypass in front of the Department's rank and file. Id. ¶ 156. Costa stated that Gauvin had "started a game" and that Costa would "continue" it and file a bypass appeal. Id. ¶¶ 158, 162; D. 24-1 at 159. Costa testified that Gauvin said he would not be upset about an appeal. D. 25 ¶ 159. He testified that Gauvin told him he could "only appeal for this, this, and this," see D. 24-1 at 161, and attested that Gauvin "falsely asserted" that Costa "could only appeal [the] decision for discrimination . . . and direct political interference, not for retaliation," 32-1 ¶ 20; see D. 33 at 3; D. 34 ¶ 35. Gauvin said that if Costa pushed the bypass appeal with the rank and file, Gauvin would remove Costa from his position. See D. 25 ¶¶ 159-60 (citing D. 24-1 at 162); D. 34 ¶ 35. Costa attested that he "interpreted [Gauvin's] comments as a clear threat against [Costa's] claiming that the bypass was retaliation for [his comments] at the union meeting." D. 32-1 ¶ 20; D. 34 ¶ 36. Costa further attested that one week later, Gauvin asked if Costa would like to take over the Department's Staff Services Division as a lieutenant, D. 32-1 ¶ 21; see D. 34 ¶ 37, a role Costa declined because it would have paid less but entailed more responsibility, D. 32-1 ¶ 21; D. 34 ¶ 39; see D. 25 ¶ 176. Lieutenant James Hoar ("Hoar") was instead appointed to the role. D. 34 ¶ 40; see D. 25 ¶ 177. In September 2022, Costa appealed the July 2022 bypass. See D. 25 ¶ 163. The Commission dismissed the appeal, indicating that if Costa was not promoted by March 1, 2023, he could move to revoke the dismissal. Id. ¶ 164; D. 34 ¶ 41.

9

### 3.    February 2023

In early 2023, a permanent captain position became available.  D. 25 ¶ 165; D. 34 ¶ 42. The candidates were Furtado (then a temporary captain), Costa and Hoar.  D. 25 ¶ 165.  After all three candidates were interviewed, Gauvin informed HRD in February 2023 that he selected Furtado as permanent captain.  Id. ¶¶ 166-67, 171; see D. 34 ¶ 42.  On March 1, 2023, Costa moved to revoke the dismissal of his earlier bypass appeal.  D. 25 ¶ 170; D. 34 ¶ 43.

### 4.    March 2023

Later in March 2023, a permanent captain position became available in Staff Services. D. 25 ¶¶ 172, 175; see D. 34 ¶ 44.  Costa and Hoar were the candidates.  D. 25 ¶ 173.  After the panel recommended Hoar, Gauvin notified HRD of his selection of Hoar, noting Hoar's experience in Staff Services.  Id. ¶¶ 174-75; D. 34 ¶ 48.  At this time, Costa had thirty-three years of experience, including twenty-two years of supervisory experience, and had more experience in Staff Services than did Hoar.  D. 34 ¶¶ 48, 50 (citing D. 32-1 ¶¶ 25-26).  Costa appealed this bypass to the Commission on March 28, 2023, and testified in this action that the appeal again resulted in a dismissal with a future effective date.  D. 25 ¶¶ 178, 180; see D. 34 ¶ 54.  Costa attested that during a prehearing conference with the Commission on April 25, 2023, Gauvin claimed that Hoar provided more detailed responses to questions about Staff Services.  D. 32-1 ¶ 27; D. 34 ¶ 51. Costa attested that this was "fabricated," because Costa was not asked questions about Staff Services.  D. 32-1 ¶ 27; D. 34 ¶ 52.  Gauvin's March 24, 2023, bypass letter to HRD stated that Hoar and Costa "were subjected to identical interview procedures."  D. 24-15 at 2; D. 34 ¶ 53.

Costa met with Gauvin and offered to drop his bypass appeals and concede to the prior bypasses if Gauvin guaranteed him a promotion to captain when Duarte retired.  D. 25 ¶¶ 181-82.[8]

---

[8] Costa attested that this conversation occurred on March 9, 2023, prior to the interviews

Gauvin declined the offer and refused to shake Costa's hand at the conclusion of the meeting.  Id. ¶¶ 182, 184.  Costa asked during this conversation if Gauvin held the compensatory time issue against Costa.  Id. ¶ 183; D. 34 ¶¶ 45-46.  After Gauvin refused the handshake, Costa stated, "Now I know where you're coming from," and Gauvin responded, "Now you know why you were bypassed."  D. 24-1 at 184; D. 25 ¶ 185; D. 34 ¶¶ 45-46.  Costa views this as confirmation that the bypasses were motivated by Costa's comments at the union meeting.  D. 32-1 ¶ 24.

In March 2024, Costa was promoted to captain.  D. 25 ¶¶ 2, 186; D. 34 ¶¶ 1, 57.  According to Costa, he holds the least lucrative captain's position and has no overtime opportunities, on-call pay or take-home vehicle.  D. 25 ¶ 186; D. 34 ¶ 61.  Costa attested that he is not permitted to attend weekly staff commander meetings, which division commanders are typically required to attend, D. 34 ¶ 61 (citing D. 32-1 ¶ 31), and that Gauvin assigned Costa as commander of Staff Services, a role often assigned to sergeants and lieutenants, D. 32-1 ¶ 30; D. 34 ¶ 59.

## V.      Procedural History

Costa initiated this lawsuit in Suffolk Superior Court on July 29, 2024, D. 1-1, and Defendants removed the action to this Court on September 25, 2024, D. 1.  Defendants have now moved for summary judgment.  D. 24.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 37.

## VI.     Discussion

As an initial matter, Costa does not oppose the entry of summary judgment for Defendants on his claims alleging violations of Massachusetts state law (Counts I and III).  D. 32 at 15.  Costa further agrees that the City is entitled to summary judgment on the remaining count and ultimately defends only his individual-capacity claim against Gauvin.  Id. at 15, 25-27.  Finally, as to

---

for the permanent captain position that Hoar would obtain.  See D. 32-1 ¶ 24.

Gauvin's statute of limitations argument with respect to the remaining claim, see D. 26 at 3-5, Costa concedes that "any injury to [him] occurring before July 30, 2021 should be dismissed" as time barred, see D. 32 at 26. He points to the May 2022, July 2022, February 2023 and March 2023 promotion decisions as supporting his remaining claim. Id.[9] Accordingly, the Court allows Defendants' motion, D. 24, to that extent and analyzes only Costa's remaining claim, that Gauvin, in his individual capacity, on or after July 30, 2021, retaliated against Costa for exercising his First Amendment rights in violation of 42 U.S.C. § 1983 (Count II).

### A. First Amendment Retaliation, 42 U.S.C. § 1983

Generally, "[c]laims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 9 (1st Cir. 2005) (alteration in original) (citation omitted). Where a public employee contends that his government employer took an adverse employment action that violated his First Amendment rights, the First Circuit has articulated a three-part inquiry. Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011). First, the Court "must determine whether the employee spoke as a citizen on a matter of public concern" and, second, "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (alterations in original) (internal citations and quotation marks omitted). These first two elements are typically questions of law to be decided by the Court. See Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003). If they are established, the analysis turns to the third element, wherein "the employee must show that the protected expression was a substantial or motivating factor in the adverse

---

[9] Although Costa characterizes all four as bypasses, see D. 32 at 26, Gauvin's counsel pointed out at the motion hearing that the May 2022 decision was not a bypass because a higher-ranked candidate was promoted.

employment decision." Decotiis, 635 F.3d at 29 (internal citation and quotation marks omitted). Even then, "the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct." Id. at 30 (internal citation and quotation marks omitted); but see Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 140 (1st Cir. 2022) (questioning whether this is distinct from "substantial or motivating factor" prong).

Here, Gauvin challenges the first element, arguing that Costa did not speak as a private citizen during the May 18, 2021 union meeting. D. 26 at 11-12.[10] Costa contends that his comments at the union meeting were those of a private citizen because, although he learned the information and work and there were police superiors at the meeting, he was not responsible for investigating payroll issues, was not reporting the conduct up the chain of command at the meeting and was not reporting activity he believed to be illegal. D. 32 at 17-18.[11] Costa further argues that he was not paid to speak at the union meeting, the information he conveyed was not related to his job duties and members of the public would likely object to Department members receiving compensation above what the union contract allowed. Id. at 20.

The First Amendment distinguishes between a public employee's citizen speech, which can trigger protection, and employee speech, which may be disciplined by the employer. Lane v. Franks, 573 U.S. 228, 237 (2014). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."

---

[10] Gauvin does not argue that Costa did not speak on a matter of public concern. See D. 26 at 11-14; Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (explaining that inquiries are distinct). Accordingly, the Court does not give significant weight to Costa's reliance upon Davignon v. Hodgson, 524 F.3d 91 (1st Cir. 2008), given that the analysis upon which he relies concerned whether the speech was on a matter of public concern. See D. 32 at 18-19; Davignon, 524 F.3d at 101-02 (concluding that speech critical of management "would not automatically [be] strip[ped] . . . of its public qualities").

[11] Costa asserts that he was assigned to the "Patrol Division" at this time. D. 32 at 18. The Court interprets this to refer to the Uniform Division. See D. 34 ¶ 17; D. 32-1 ¶ 11; D. 24-3 at 13.

Id. at 240.  In considering this question, the First Circuit has identified several non-exclusive factors, including "whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it 'official significance'); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech."  Gilbert v. City of Chicopee, 915 F.3d 74, 82 (1st Cir. 2019) (quoting Decotiis, 635 F.3d at 32).  To the extent there is no material factual dispute regarding "the circumstances in which" Costa spoke, this is a question of law.  See Bruce, 34 F.4th at 135.

Although Gauvin recites the factors relevant to the Court's analysis, see D. 26 at 12, he largely eschews any discussion of same, primarily arguing that Costa has, in Gauvin's view, conceded that Costa had a duty to report Gauvin's alleged misconduct and was acting pursuant to same during the union meeting, see id. at 14.  Considering, however, the full scope of the relevant factors and drawing all reasonable inferences in Costa's favor, the Court concludes that given what a reasonable juror could find regarding the circumstances of Costa's speech, Costa was speaking as a citizen during the union meeting.  See Bruce, 34 F.4th at 135.

To be sure, some factors indicate that Costa's speech was that of a public employee.  The record reflects that the union meeting took place at the Department.  See D. 24-8 at 3 (stating that general meeting occurred in "Community Room FRPD"); Decotiis, 635 F.3d at 33 n.12 (noting that "speech made within one's office or workspace is [not] necessarily unprotected" but that "the more intertwined . . . speech is with the employee's work station the less likely it is that the speech is protected as citizen speech").  The other meeting attendees were members of the Department,

14

including members who outranked Costa.  See D. 24-8 at 3; D. 24-1 at 209; Decotiis, 635 F.3d at 33 (noting that "speech made to an audience to which an employee only has access through [his] job is generally less akin to citizen speech").  Costa addressed same "at a forum to which he had access because of his position," suggesting there is no "citizen analogue" for his speech.  See Foley v. Town of Randolph, 598 F.3d 1, 7 (1st Cir. 2010); Perkins v. City of Attleboro, 969 F. Supp. 2d 158, 173-74 (D. Mass. 2013) (concluding that plaintiff's letter to union president "was, in effect, a complaint or concern about the management of the Fire Department" and that complaint to union was not a channel available to general public); cf. Curran, 509 F.3d at 46 (noting that court would "assume arguendo that [plaintiff] was acting as a citizen since the [relevant] posting was on a union website open to public posting and viewing").  As Costa acknowledges, see D. 32 at 17-18, the knowledge that formed the basis of his speech at the meeting was also obtained through his employment, by reviewing Department payroll records, see D. 34 ¶¶ 2, 7, 9.  While Costa contends that his speech involved no "special" knowledge related to his employment because "it was not related to his job duties, and nothing indicates that the information was part of an ongoing investigation or that Defendants sought to keep the information confidential," see D. 32 at 20, he does not cite any authority indicating that such is required.  See Gilbert, 915 F.3d at 77-78, 83 (concluding that officer "derived [the relevant] information from the special knowledge obtained during the course of his employment" where speech concerned incident during which colleague allegedly pointed weapon at him and court inferred such "happened at work"); Thomas v. Town of Salisbury, 277 F. Supp. 3d 161, 168, 173 (D. Mass. 2017) (noting, in concluding that officer was speaking as public employee, that the "allegations contained in his letter were all derived from information he had obtained on the job as a police officer" from "other police officers"); Amirault v. City of Malden, 241 F. Supp. 3d 288, 301 (D. Mass. 2017) (concluding that relevant information

"would not have been available to [the plaintiff] outside the context of his employment" as a detective); cf. Bruce, 34 F.4th at 137 (concluding that reasonable juror could find that "speech [in news interview] did not derive from any special knowledge that [bus driver] had gained as a public employee but was based instead on the common-sense premise (or, at most, a premise that he could have learned as a union official) that cuts to [transit authority's] budget would impact [its] service").

Other factors, however, support the conclusion that Costa was speaking as a private citizen. Costa was off duty during the union meeting. D. 34 ¶ 4; D. 24-1 at 206. Further, it seems extremely unlikely that "anyone who observed" Costa's speech (which consisted of complaints to colleagues about some members of the Department receiving benefits beyond those permitted under the union contract, see D. 24-8 at 5) would take his speech to "bear the imprimatur" of the Department. See Foley, 598 F.3d at 8; see, e.g., Stuart v. Town of Framingham, 301 F. Supp. 3d 234, 241 (D. Mass. 2018) (concluding that officer's complaints made in contravention of police chief's orders and union letter plaintiff co-authored could not give impression that plaintiff was representing department); Ballinger v. Town of Kingston, No. 18-cv-11187-FDS, 2019 WL 6726689, at *15 (D. Mass. Dec. 10, 2019) (concluding that "[n]o reasonable observer [at a termination hearing] would have believed that [a police sergeant's] complaints about widespread evidence mishandling represented the Town's view"); Meagher v. Andover Sch. Comm., 94 F. Supp. 3d 21, 37 (D. Mass. 2015) (concluding that plaintiff "was working in her capacity as a [u]nion activist rather than in her capacity as a high school English teacher," including because her speech "would not have given objective observers the impression that [she] was representing her employer when she communicated with her colleagues"). Moreover, although Gauvin highlights that at least some attendees of the union meeting outranked Costa, see D. 26 at 11, it is

16

not clear that Costa's complaint regarding the compensatory time issue in this context could reasonably be viewed as a report up the chain of command. Compare Root v. Mont. Dep't of Corr., No. 18-cv-164, 2021 WL 1341918, at *15 (D. Mont. Jan. 19, 2021) (concluding that union grievance was protected speech where it did "not appear that [corrections officer's] union grievance (as opposed to his [statutory] reporting) was required by his job duties"), report & recommendation adopted, No. 18-cv-164, 2021 WL 1085657 (D. Mont. Mar. 22, 2021), with Weintraub v. Bd. of Educ., 593 F.3d 196, 201-03 (2d Cir. 2010) (concluding that plaintiff, "by filing a grievance with his union to complain about his supervisor's failure to discipline a child in his classroom, was speaking pursuant to his official duties and thus not as a citizen" because speech furthered his ability to execute his duties as a teacher).

As to Gauvin's primary argument, that Costa's speech was a report of illegality pursuant to his official duties, see D. 26 at 14, the Court concludes that a reasonable jury could find otherwise based on the full context of the record evidence. During the relevant time period, Costa was a lieutenant in the Uniform Division, D. 34 ¶ 17; see D. 25 ¶¶ 72, 101, which has "the primary responsibility for protecting the public from unlawful acts and other hazards to public safety" and can "assist investigators assigned to perform follow-up investigative activities," see D. 24-3 at 13. Costa attested that such officers "were generally required to provide physical security, patrol key areas, respond to incidents, and support special operations" but "did not perform serious internal investigations into officer misconduct." D. 32-1 ¶ 11; see Gutwill v. City of Framingham, No. 16-cv-12191-IT, 2020 WL 360486, at *8 (D. Mass. Jan. 22, 2020) (concluding that jury could find that detective was speaking as private citizen where he "worked as a narcotics detective around the time he complained about [a colleague's] testimony and about corruption within the Narcotics Unit" and he "was not directed by supervisors to make reports, nor was reviewing testimony or

17

reporting internal corruption a task to which he was assigned"), aff'd on other grounds, 995 F.3d 6 (1st Cir. 2021); cf. Amirault, 241 F. Supp. 3d at 300-03 (concluding that detective was speaking as public employee where "each of his statements occurred in the context of meetings with other officials to report on or otherwise discuss the status of a criminal investigation").  The record provides the additional context that in December 2020, Costa had a dispute involving Cardoza regarding compensatory and vacation time, which culminated in a City attorney advising with respect to the vacation time that if Costa and Cardoza entered a side agreement regarding same, without the union's involvement, such would violate Chapter 150E. D. 24-1 at 89-95; D. 24-6 at 7-9.[12]  The May 18, 2021 union meeting minutes reflect that Costa raised four instances of members receiving "side benefits . . . outside" of the union contract, two of which related to the Major Crimes Division. See D. 24-8 at 5.  Costa testified that his "intention at th[e] meeting was to light a fire under the union executive board's rear" and that he wanted "the union to bring . . . the [C]ity to the table and . . . bring to light these 150E violations that they accused [Costa] of trying to do." D. 24-1 at 112-13.  Costa further testified that he wanted the union to "get it all in a side letter because" Cardoza was "allowing certain people to get compensation outside the union contract[] which they accused [Costa] of," and that Costa was "giving pushback" because the City could not "have it both ways." Id. at 113-14.  Finally, Costa testified that he was "a union guy [at] heart" which was "why [he] made the issue." Id. at 114.  While it is true that the Department's rules required employees to report their colleagues, through the chain of command, for violations

---

[12] Notably, with regard to the vacation time, Costa complained that some members of the Department had received "1 day more than the[ir] entitlement as defined by [the union] contract." D. 24-6 at 5.  He contended that "this practice, although technically against [that] which is granted by contract, was interpreted differently by more than a third of the eligible complement for over ten years[,] which establishes an undeniable pattern of past practice, and to deny others the same benefit to some while under the same [union contract] . . . is unfair and inequitable." Id. at 6.

of "laws, ordinances, [or] rules of the Department," D. 24-3 at 18, the Court is not convinced that, as a matter of law, such governs the circumstances of Costa's speech here.  See, e.g., Stuart, 301 F. Supp. 3d at 240 (concluding that officer's "generalized duty to report wrongdoing [did] not make reporting of [defendant's] conduct one of [his] job duties"); cf. Jakuttis v. Town of Dracut, 656 F. Supp. 3d 302, 329-30 (D. Mass. 2023) (finding such generalized duty persuasive, where other factors supported conclusion that speech was made as public employee), aff'd in part on other grounds, 95 F.4th 22 (1st Cir. 2024).[13]  The Court also notes that the union meeting minutes reflect that the executive board—all of whom were presumably subject to the same reporting duty as Costa—took the position that "should the administration continue to give benefits outside the [union contract]," such extracontractual benefits should "be maintained."  D. 24-8 at 5-6.

Considering all of these factors together, the Court concludes that, "given what a reasonable juror could find about the circumstances in which" Costa spoke during the union meeting, he was speaking in his capacity as a citizen.  See Bruce, 34 F.4th at 136; Scalone-Finton v. Falmouth Pub. Schs., No. 21-cv-11792-JEK, 2024 WL 4335451, at *10 (D. Mass. Sept. 27, 2024) (concluding, where factors "point[ed] in different directions," that reasonable jury could conclude speech was made as private citizen).  Accordingly, the Court denies this basis for allowing the motion for summary judgment.[14]

---

[13] For this reason, the Court is not persuaded by Gauvin's reliance upon Jakuttis.  See D. 26 at 12-13.  Nor do the other cases that Gauvin argues are "legal comparators," id. at 12, compel a different conclusion.  In Gilbert, the plaintiff was ordered to write the report that comprised his speech, which was escalated through the chain of command, and the court noted that to the extent the plaintiff's claim was premised on other speech, such "arose in essentially the same police department internal affairs context."  Gilbert, 915 F.3d at 83-84.  In Alves v. City of Gloucester, 594 F. Supp. 3d 315 (D. Mass. 2022), the court's analysis appears to turn primarily on whether the plaintiff was speaking on a matter of public concern, see id. at 330-32, which Gauvin does not challenge here, see D. 26 at 11.

[14] Gauvin argues in one sentence that "Costa has no evidence that can make out a retaliatory motive based upon Costa's speculation that Gauvin corrupted the [interview] panel or even fed

### B.    Qualified Immunity

The Court, however, concludes that summary judgment for Gauvin is warranted on the separate ground of qualified immunity.    Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Pearson v. Callahan, 555 U.S. 223, 231 (2009).  In determining whether a government official is entitled to qualified immunity, the Court must determine: (1) "whether the plaintiff's version of the facts makes out a violation of a protected right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Alston v. Town of Brookline, 997 F.3d 23, 50 (1st Cir. 2021) (quoting Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017)).  As to the second determination, "[t]he question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted."  Alfano, 847 F.3d at 75.  This second prong has two aspects:  "whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right" and "whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right."  Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32-33 (1st Cir. 2011)).

---

Hoar interview questions."  See D. 26 at 14.  To the extent Gauvin intends to challenge the third prong of the First Amendment retaliation analysis, the Court declines to consider the merits of same because Gauvin has not sufficiently developed it, see, e.g., United States v. Caparotta, 676 F.3d 213, 218 (1st Cir. 2012) (concluding that argument was waived where it consisted of "just two sentences and two cursory citations"), and because the Court allows the motion on another ground.

Although Gauvin must "prove the existence of circumstances sufficient to bring the defense into play," Alston, 997 F.3d at 50, which he has, see D. 25 ¶¶ 50-57, 108-33; D. 26 at 18-20, Costa bears the "heavy burden" of demonstrating that the law was clearly established at the time of the alleged violations, see Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st Cir. 2021) (quoting Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015)); Decotiis, 635 F.3d at 37.  In his qualified immunity argument, D. 26 at 18-20 (to which Costa did not respond, D. 32 at 17-26), Gauvin focuses on the second half of the second prong of the qualified immunity determination, arguing that he reasonably could have believed that Costa's speech at the union meeting was that of a public employee.  D. 26 at 20; see, e.g., Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (noting that court can address qualified immunity prongs in any order).  Qualified immunity often applies in this context because "whether the plaintiff spoke as a citizen on a matter of public concern . . . [is] fact-intensive and can rarely be considered clearly established for purposes of the Harlow qualified immunity standard."  Ballinger, 2019 WL 6726689, at *17 (internal citation and quotation marks omitted); see, e.g., Jakuttis, 95 F.4th at 31-32 (affirming summary judgment, not on the merits of First Amendment retaliation claim but on qualified immunity grounds, where record did not show that defendants would have understood that officer was speaking as a private citizen).  Such is the case here.  See, e.g., Ballinger, 2019 WL 6726689, at *15-17 (reaching same conclusion where court concluded plaintiff spoke as private citizen but factors pointed in different directions); Griffin v. Univ. of Me. Sys., No. 22-cv-00212-JDL, 2023 WL 5279660, at *11-12 (D. Me. Aug. 16, 2023) (concluding, where evaluation of nature of speech "produce[d] a mixed result" at motion to dismiss stage, that supervisor was entitled to qualified immunity because "it would not have been plainly obvious to every reasonable official" whether the speech was protected or "merely amounted to a privately communicated employee grievance" and whether it "was made

within the scope of [plaintiff's] employment").  The Court concludes that, even assuming that Costa has made out a First Amendment violation in connection with the promotion decisions, Gauvin is entitled to qualified immunity because an objectively reasonable official in his position could have believed that his conduct did not violate Costa's constitutional rights.[15]

## VII.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment, D. 24, is ALLOWED.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

---

[15] In addition to damages, the complaint's prayer for relief includes a request for the Court to "issue temporary restraining orders or preliminary or permanent injunctions to restrain continued violation of this section," see D. 1-1 at 13, and the qualified immunity defense does not apply to same, see Pearson, 555 U.S. at 242-43.  Costa, however, has not suggested that such relief is being requested (or could be requested) as to Gauvin in his individual capacity, see Martins Beach 1, LLC v. Turnbull-Sanders, No. 16-cv-05590-JSW, 2018 WL 5623701, at *9 (N.D. Cal. Aug. 13, 2018) (noting authority indicating that § 1983 plaintiff cannot obtain equitable relief from individual-capacity defendant); Knowlton v. City of Wauwatosa, 119 F.4th 507, 519 (7th Cir. 2024) (stating that "[i]n an individual capacity suit, a plaintiff may only seek monetary damages; in an official capacity suit, a plaintiff may only seek injunctive or declaratory relief"), and in any event, such request would be moot given that Gauvin has not been Costa's appointing authority since October 2024, see D. 25 ¶¶ 8-10.